**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| JOSEPH MIROCHA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 11-cv-4542 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| PALOS COMMUNITY HOSPITAL and KEN LASH, | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Joseph Mirocha brings this action against Defendants Palos Community Hospital and Ken Lash alleging age discrimination, retaliation, defamation, intentional and negligent infliction of emotional distress, and failure to pay Plaintiff for unused sick leave. Currently before the Court are the parties' cross-motions for summary judgment [146] and [167]. For the reasons that follow, the Court grants Defendant's motion for summary judgment [146] and denies Plaintiff's cross-motion for summary judgment [167] as to Plaintiff's federal claims in Counts I and II. In view of that disposition of the federal claims, Plaintiff's remaining state law claims in Count III through Count X are dismissed without prejudice. The Court will enter a final judgment and close the case.

## I.      Background

The following facts are drawn primarily from the parties' Local Rule 56.1 statements, [148], [168], and [173].[1] This case arises from the termination of Plaintiff Joseph Mirocha from

---

[1] As a preliminary matter, the Court notes that Local Rule 56.1 requires a party moving for summary judgment to submit a statement of material facts as to which the movant contends there is no genuine issue and entitles the movant to judgment as a matter of law. The "movant's 56.1(a) statement should contain *only* factual allegations" and "be limited to material facts, that is, facts pertinent to the outcome of the issues identified in the summary judgment motion." *Malec v. Sanford*, 191 F.R.D. 581, 583 (N.D. Ill.

Defendant Palos Community Hospital ("PCH") in April 2011. PCH hired Plaintiff as the Electrical Department Supervisor on October 6, 2003, when Plaintiff was fifty-one years old. [148, at ¶ 27.] Plaintiff reported to Defendant Ken Lash, Manager of Clinical Engineering, who in turn reported to Marty Baron, Vice President of Facilities. [*Id.* at ¶ 28.] Plaintiff was terminated on April 8, 2011, when he was fifty-nine years old. [See *id.* at ¶ 50.] Defendants allege that Plaintiff was terminated from PCH because of his failure to fulfill his job duties relating to the electrical database. [*Id.* at ¶ 32.] Plaintiff alleges that he was fired because of his age. [168, at ¶ 42.]

---

2000). Local Rule 56.1 also requires the nonmovant to file a "concise response" to the movant's statement of facts containing "any disagreement, specific references to the affidavits, parts of the record, and other supporting materials." L.R. 56.1(a). "A general denial is insufficient to rebut a movant's factual allegations; the nonmovant must cite specific evidentiary materials justifying the denial." *Malec*, 191 F.R.D. at 584. Rule 56.1(b)(3)(C) is not satisfied by "purely argumentative denials," *id.*, or "evasive denials that do not fairly meet the substance of the material facts asserted." *Bordelon v. Chi. Sch. Reform Bd. of Trs.*, 233 F.3d 524, 528 (7th Cir. 2000). "The purpose of the 56.1 statement is to identify for the Court the evidence supporting a party's factual assertions in an organized manner[;] it is not intended as a forum for factual or legal argument." *Malec*, 191 F.R.D. at 585.

Plaintiff's Response to Defendants' Statement of Facts [168] does not comply with these requirements. Many of Plaintiff's "concise responses" do not directly address Defendants' statement of facts but rather amount to lengthy recitations of unrelated allegations, some more than eight pages long. [See, *e.g.*, 168, at ¶ 44.] Additionally, many of Plaintiff's responses set forth improper arguments, offer assertions without citations to specific evidentiary materials, misrepresent the record, and are so repetitive that any relevant facts or responses are obfuscated in a deluge of unrelated or irrelevant assertions.

Nonetheless, the Court will exercise its discretion in the direction of leniency and consider the portions of Plaintiff's responses that arguably meet the requirements of the local and federal rules. *Modrowski v. Pigatto*, 712 F.3d 1166, 1169 (7th Cir. 2013) (making clear that, although district courts have discretion to require strict compliance with Rule 56.1, "[i]t does not follow * * * that district courts cannot exercise their discretion in a more lenient direction"). Where Plaintiff's response sets forth an argument, a legal conclusion, or denies a statement of fact improperly by failing to cite specific evidentiary materials supporting the denial, the Court will not consider that response and the Defendants' statement of fact will be deemed to be admitted. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584; *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 2016 WL 5476235, at *2 (N.D. Ill. Sept. 29, 2016). Additionally, the Court disregards a denial that does more than negate its opponent's fact statement—that is, it is improper for a party to smuggle in new facts into its response to a party's Rule 56.1 statement of fact. See, *e.g.*, *Ciomber v. Cooperative Plus, Inc.*, 527 F.3d 635, 643 (7th Cir. 2008); *Tolson v. City of Chicago*, 2016 WL 1043326, at *1 (N.D. Ill. Mar. 16, 2016).

## A. PCH's Electrical Equipment

PCH is accredited by the Joint Commission on Accreditation of Health Care Facilities ("Joint Commission"). [148, at ¶ 10.] To maintain accreditation, PCH's Safety Steering Committee and its subcommittees ensure that PCH is compliant with the Joint Commission's standards by developing and executing management plans for various areas, including utility systems and medical equipment. [*Id.* at ¶ 11.] PCH employees are expected to conduct preventative maintenance on the electrical equipment and to document that maintenance.[2] [*Id.* at ¶ 12.]

In 2010, PCH began a six-year expansion project, which involved the construction of a new building and required the addition of several hundred new devices and pieces of health care equipment, all of which needed to be entered into an electrical database. [*Id.* at ¶¶ 17, 26.] Prior to January 2011, PCH tracked information in two separate databases: the electrical equipment database and the electrical panel database. [*Id.*, Exhibit C (Baron Deposition), at 22:10–23:20.] The electrical equipment database tracked information about equipment that was subject to preventative maintenance. [*Id.* at 22:10–20.] The electrical panel database tracked information about circuit panels, such as "where they are fed from, what areas they served, if they had additional space in them for growth and if they had breakers that were unused[.]" [*Id.* at 22:15–23:3.] When the two separate databases were created, they had different functions and different requirements. [*Id.* at 79:2–8.] The electrical panel database was not originally conceived to schedule preventative maintenance. [*Id.*; see also *id.* at 22:15–23:3.] Around January 27, 2011, the electrical panel database was merged into the electrical equipment database. [*Id.* at ¶ 25.]

---

[2] Preventative maintenance is regularly scheduled service to a piece of equipment that is conducted at appropriate intervals, which are often recommended by the manufacturer. [148, at ¶ 22.]

## B.     Maintaining the Databases

Defendants allege that as the Electrical Supervisor, Plaintiff was responsible for maintaining electrical safety throughout the hospital, including maintaining the electrical equipment database, performing incoming inspections, writing preventative maintenance procedures and ensuring that those procedures were performed, working with the safety officer to ensure that fire alarm preventative maintenance and repairs were conducted, and performing any other tasks requested by Baron and work delegated by Defendant Lash.  [*Id.* at ¶¶ 30, 34.] On September 29, 2008, Defendant Lash emailed Plaintiff two Excel spreadsheets to assist Plaintiff in ensuring, and to facilitate their future discussions about, the accuracy of the electrical equipment database.  [*Id.* at ¶ 37.]   In November 2008, Defendant Lash questioned Plaintiff about the completeness of the electrical equipment database, including the accuracy of the preventative maintenance tasks listed.  Plaintiff agreed to make improvements in these areas. [*Id.* at ¶ 38.]   During Plaintiff's September 30, 2010 Management Performance Appraisal, Defendant Lash again directed Plaintiff to improve the accuracy of the electrical equipment database.  [*Id.* at ¶ 39.]  Specifically, Plaintiff's September 30, 2010 Management Performance Appraisal states as follows:

**Major Job Function 1.** Responsible for electrical work performed throughout the hospital, grounds and satellite facilities.

**Comments:** Under [Plaintiff's] direction, the daily electrical needs of the hospital and satellite facilities have been satisfactorily met.  [Plaintiff] needs to improve in the promptness of entering incoming inspections of new equipment into the electrical database and the completeness of the required fields for equipment entries including serial numbers, model numbers, and acquisition dates. [Plaintiff] also needs to make sure that all equipment histories are accurate and include work by outside vendors.

* * *

**Work Goals**
1. To verify the accuracy of the electrical equipment database and service histories, including entering incoming inspections promptly and completely.

[*Id.*, Exhibit A5, (September 30, 2010 Management Performance Appraisal).]

Plaintiff disagrees that he was responsible for maintaining the electrical equipment database. Rather, Plaintiff contends that the Hospital Equipment Management Program policy requires Defendant Lash, as Manager of the Clinical Engineering, to document each piece of equipment into the database. Plaintiff asserts that PCH's policy states:

> The department managers shall be responsible for entering all the necessary information for new equipment when it is put into service, this includes information such as PCH number, model number, serial number, manufacturer, user department and any other information which is necessary to maintain proper records. The department managers will also be responsible for setting up a comprehensive preventive maintenance schedule for each piece of equipment.

[168, ¶ 21; see also 168, Exhibit 6.] Defendants acknowledge that Plaintiff's job description did not explicitly include the responsibility of maintaining the equipment database but submit that Defendant Lash, as Plaintiff's supervisor, delegated to Plaintiff the responsibility of maintaining the database. [173, at ¶ 8; 148, at ¶ 35.] Plaintiff concedes that as his supervisor, Defendant Lash delegated work to him and was responsible for ensuring that he performed the work assigned to him. [148, at ¶ 34; 168, at ¶ 34.] Plaintiff also admits that Defendant Lash delegated to Plaintiff the responsibility of maintaining the electrical equipment database. [168, at ¶ 35.] However, on February 3 or 4, 2011, Plaintiff told Lash that he did not think it was his job to enter the data and update the database. [*Id.*]

Additionally, Plaintiff claims that Defendant Lash was responsible for updating the other database—the electrical panel database—but failed to do so. [168, ¶ 24(m).] Plaintiff contends that the electrical panel database lacked PCH-required fields—such as fields for model number, serial number, and manufacturer—from 1995 until January 2011, when the panel database was

merged into the equipment database. However, the record evidence demonstrates that in February 2011, Plaintiff acknowledged that he had been working on both the equipment database and the panel database. [168, Exhibit 24.]

### C. Plaintiff's January 28, 2011 Deadline (Thirty Day Deadline)

On December 30, 2010, Defendant Lash told Plaintiff that he was still not satisfied with Plaintiff's progress on the electrical equipment database and gave him thirty days to bring the database into full compliance. [148, at ¶ 40; 148, Exhibit B1 (December 30, 2010 File Memo).] In January 2011, Baron told Defendant Lash that the electrical equipment database was deficient and directed Defendant Lash to make sure that it was up to date. [148, at ¶ 41.]

Plaintiff alleges that in December 2010, the electrical equipment database "was in good shape." [168, ¶ 40.] Yet, he also contends that it was difficult to meet this thirty day deadline. Plaintiff alleges that in or about 2010, the Electrical Department facilitated the largest electrical infrastructure cut-over in the history of PCH, "which required many months of man hours to be devoted and taken away from the electricians' day to day responsibilities." [168, at ¶ 10.] According to Plaintiff, the thirty day deadline "virtually caused his department to be shut down in order to meet this deadline," [168, at ¶ 9], and the demands made upon him concerning the electrical database were "designed to cause him to quit and/or designed to set him up for involuntary termination." [*Id.*]

Around January 27, 2011, the electrical panel database was merged into the electrical equipment database. [148, at ¶ 25.] Baron testified that he believed that the electrical panel database was updated on a regular basis. [148, Exhibit C, at 25:7–9.] Plaintiff contends that the panel database was not up to date, and thus when it was merged into the equipment database, the completion rate dropped from over 90% to 60%. [168, at ¶ 41.] According to Plaintiff, he met

his thirty day deadline by updating the equipment database by January 27, 2011. [*Id.* at ¶ 24(q); see also 168, Exhibit 2 (Mirocha Unsworn Declaration), at ¶ 20.] However, Plaintiff contends that after his work day ended at 3:30 pm on January 27, 2011, Defendant Lash had the electrical panel database moved into the electrical equipment database, which created thousands of empty fields in the equipment database that needed to be filled in, making it impossible for him to complete his task by the January 28, 2011 deadline. [*Id.* Exhibit 2, at ¶ 20.] Plaintiff does not deny that Defendant Lash advised Plaintiff that any deficiencies caused by the merging of the two databases were not held against him and that he could cure those deficiencies at a later date. [148, at ¶ 43; 168, at ¶ 44.]

Plaintiff alleges that Defendant Lash and Baron also set up obstacles to Plaintiff performing his job by: (1) adding 16 "new job tasks" between the January 2011 and March 16, 2011, "intentionally setting [Plaintiff] up for failure and creating impossible deadlines"; (2) instructing Plaintiff to refrain from talking to the electrical contractor installing the electrical equipment Plaintiff was required to enter into the database; and (3) instructing Plaintiff to refrain from discussing the electrical infrastructure with Tony Maiellaro, Manager of Plant Engineering. [168, at ¶¶ 11–12; 168, Exhibit 2 (Mirocha Unsworn Declaration), at ¶¶ 8–9.]

### D.     Baron's February 2011 Review of Defendant Lash

On February 3, 2011, Baron filed a report regarding Lash's January evaluation. [148, Exhibit D6.] Baron asserted that Lash had made progress in his work goal of updating the electrical database but noted that the database was still missing information for many pieces of equipment and that only 56% of the required preventative maintenance on "critical utility equipment" had been completed. Baron wrote in the report that Lash "referred to making completion of this [preventative maintenance] database a goal for [Plaintiff] to complete in 3

months on his evaluation last fall, and additionally gave [Plaintiff] 30 more days to complete this in early January 2011 when he failed to meet the first goal." [*Id.*] Baron's report also states that he and Lash discussed how PCH's documentation requirements had not changed during Plaintiff's tenure at the hospital and that the lack of appropriate documentation for new equipment has put PCH at risk for its next Joint Commission inspection. Finally, Baron suggested that Lash continue to follow the progressive disciplinary process for Plaintiff. [*Id.*]

Plaintiff claims that Baron was incorrect and that he was not given a three month deadline to complete the database updates in his September 30, 2010 Management Performance Appraisal. [168, at ¶ 42; Exhibit 23.] Defendant Lash testified in his deposition that he did not give Plaintiff a specific deadline for updating the database in Plaintiff's September 30, 2010 Management Performance Appraisal. [148, Exhibit B (Lash Deposition), 146:14–147:3.] However, Defendant Lash also testified that Plaintiff's work on the project was already late at the time of his September review. [*Id.*]

### E. Plaintiff's Request for a Promotion

On February 4, 2011, Plaintiff sent Defendant Lash an email requesting a promotion. [168, Exhibit 24.] In his email, Plaintiff acknowledged that on December 30, 2010, Defendant Lash gave him thirty days to "bring the electrical database to 100% accuracy with maintenance procedures to be updated and added." Plaintiff asserted that "[t]he largest task of the two databases was not the equipment database [sic] it was the panel database." Plaintiff noted that "[o]ver the years, I have been directed to do the database entries including maintenance procedures. I have during the last year updated the equipment database on a monthly basis." Plaintiff also acknowledged that he had worked on the panel database and expressed his dissatisfaction with the merging of the two databases, stating:

> While updating the panel database, the 30 day time limit conditions changed two weeks into the job. * * * Three weeks into updating the panel database it was moved into the equipment database and I am now told I failed with there being no manufacturer, serial number or model number entered in the fields. This again changed the original direction of the 30 day time limit.

[*Id.*] Plaintiff did not explicitly reference age discrimination in his February 4, 2011 email to Defendant Lash. Rather, he stated his belief that he had been singled out since the central plant was in "the same situation," yet Rich Chapan from Plant Engineering was "under no threat of discipline and he ha[d] not completed updating their database." [*Id.*] Plaintiff went on to explain that he believed maintaining the database and establishing maintenance procedures to be "at a job level above [his]." Additionally, he admitted that he had "total responsibility" for "the entire database," stating: "Although under 'performing other related duties' [sic] may cover my doing some of the database entry I do not believe it would include total responsibility for establishing all procedures and policies and maintaining the entire database as I have been doing." [*Id.*] Thus, Plaintiff requested that Defendant Lash promote him to Manager with an increase in salary compensate him "for the work [he was] actually doing." [*Id.*]

### F. Plaintiff's February 21, 2011 Deadline

On February 4, 2011, Defendant Lash issued Plaintiff a Corrective Action Form indicating that Plaintiff had failed to fulfill his job duties related to the electrical database. [148, Exhibit A7.] In the accompanying memo, Defendant Lash asserted that on January 30, 2010, Plaintiff was given a thirty day deadline to bring the electrical database into full compliance. [148, Exhibit A8 (February 4, 2011 File Memo).] The memo explained that although Plaintiff had made significant improvements in the state of the database, more work needed to be done, and he had missed the goal of full compliance in thirty days. [*Id.*] Specifically, Defendant Lash indicated that "[t]he major database deficiencies at this time include providing completeness of

data entries, (particularly with the equipment brought over from the panel database), setting up correct [preventative maintenance] procedures on electrical infrastructure equipment, and updating the emergency procedures." [*Id.*] Defendant Lash gave Plaintiff a new deadline of February 21, 2011 to update the emergency procedures and indicated that he would "allow the data elements from the equipment previously in the panel database to be updated during the performance of the infrared scanning." [*Id.*] Defendant Lash warned Plaintiff that "[f]ailure to meet either of these expectations will result in an escalation in the corrective action process." [*Id.*]

> Defendant Lash's memo also discussed Plaintiff's work more generally, stating:
>
> Looking back to [Plaintiff's] tenure at [PCH], I think that his most significant failure as the electrical supervisor has been his inability to identify what his job duties are and then to work well independently. [Plaintiff] is very good at performing "work as assigned" but the position of electrical supervisor requires much more than that. The foundation of the entire electrical department depends on an accurate database and his neglect of this over the years has led to the desperate state that he is in now. [Plaintiff] has been employed at [PCH] since September 2003 and any database inadequacies that exist are his responsibility and not his predecessors.

[*Id.*] Finally, the Defendant Lash addressed Plaintiff's assertion in his February 4, 2011 email that "maintaining the database, to establish and create maintenance procedures" is a job level above his, stating "I believe it is reasonable for an experienced electrical supervisor to be responsible for setting up [preventative maintenance] procedures." [*Id.*]

Defendants maintain that by February 24, 2011—three days after Plaintiff's new deadline—Plaintiff still had not cured the deficiencies in the electrical equipment database. [148, at ¶ 44.] On February 24, 2011, Defendant Lash sent Plaintiff an email stating that he wanted to "pro-actively provide [him] with feedback to assist [him] in completing the tasks that were assigned," and that he edited a document to help Plaintiff "visualize which fields may still

require more information to be provided." [*Id.*, Exhibit B6 (February 24, 2011 Email).] Defendant Lash asked Plaintiff to "[p]lease review this list for any missing information and complete as needed. * * * As you know, I will have to explain any missing information to Mr. Baron upon his return next week." [*Id.*] The email also stated, "FYI, the electrical department's [preventative maintenance] completion percentage is 95.45 for general equipment and 97.38 for utility equipment which is very good." [*Id.*]

### G. Plaintiff's Internal Complaint

On February 4, 2011, Plaintiff told Defendant Lash that he was going to complain to human resources that Rich Chapan was not disciplined for database deficiencies. Plaintiff said nothing about age discrimination. [148, at ¶ 54.] On February 18, 2011, Plaintiff complained to Mary Denisienko, PCH's Vice President of Human Resources, that he was being discriminated against because of his age because Chapan was not disciplined for the same database deficiencies. [*Id.* at ¶ 55.] Defendants investigated Plaintiff's complaint, in part through gathering more information about Plaintiff's harassment claim by asking Holly Brasher and Diane Pleines of the Human Resources Department to speak with Plaintiff. [*Id.* at ¶ 56; Exhibit E (Mary Denisienko Deposition), 45:19–47:6; 168 Exhibit 2B (HR Email).] Brasher met with Plaintiff on March 21, 2011. [See *id.*, Exhibit F (Mary Brasher Deposition), 46:11–47:1.] Denisienko also looked at the files of the individuals Plaintiff identified whom he believed supported his claim to see if there were any complaints related to age discrimination and to see the reasons they had changed jobs, but she did not find any support for Plaintiff's claim. [148, Exhibit E, 56:15–58:1.] Denisienko responded to Plaintiff that there was no support for his discrimination complaint. [*Id.*, at ¶ 57.]

Chapan's position at PCH is Chief Operating Engineer, and he reports to Tony Maillero,

Manager of Plant Engineering. [*Id.*, at ¶ 6.] Chapan is not in the same position as Plaintiff, does not report to the same manager, is in a lower pay grade, and is paid on an hourly basis, whereas Plaintiff was paid a salary. [*Id.* at ¶ 58.] Among other things, Chapan is responsible for entering data into the electrical equipment database from incoming inspection sheets for all new equipment that comes into the central plant. [*Id.* at ¶ 59.] Chapan testified that he understood that if he failed to enter the data into the electrical equipment database, he would be subject to discipline. [*Id.* at ¶ 60.] Chapan completed his database project by January 28, 2011. [*Id.* at ¶ 61.]

## H. Plaintiff's March 25, 2011 Deadline

Around March 4, 2011, Defendant Lash shared with Plaintiff a draft memorandum that he intended to share with Baron. [*Id.* at ¶ 45.] The memorandum was based on Defendant Lash's initial impression of the status of the electrical equipment database and commended Plaintiff for satisfying his obligations. [*Id.*] However, on March 8, 2011, Defendant Lash revised his draft memorandum to reflect that while his initial impression was that Plaintiff was successful in meeting his deadline, a closer scrutiny of the issues revealed that there were still areas that required additional work in order to meet department and Joint Commission requirements. [*Id.* at ¶ 46; 168, at Exhibit 29.] Defendant Lash stated that Plaintiff must complete the additional work by March 25, 2011.

On March 24, 2011, Plaintiff sent Defendant Lash an email stating that he had completed the tasks and that he needed Defendant Lash's approval to enter three additional preventative maintenance procedures. [148, at ¶ 47, Exhibit B8.] Defendant Lash did not respond to this email, and he did not respond to Plaintiff's March 23, 2011 email asking Defendant Lash to advise on whether Plaintiff should create the three additional maintenance procedures. [168, at

¶ 47.] Defendant Lash asked Baron to evaluate the accuracy of the electrical equipment database. [148, at ¶ 48.] Defendants contend that Defendant Lash also spot-checked the accuracy of Plaintiff's recordkeeping on 48 items in the power plant and electrical gear and found an error rate of over 50%. [*Id.* at ¶ 49.] Plaintiff asserts that Lash's spot-check contained errors and inaccurate information, that the error rate from the spot check was actually 2.67%, and that Lash did not discuss the results of the spot-check with Plaintiff. [168, at ¶ 49.] Neither Defendant Lash nor Baron spoke to Plaintiff about his work performance after March 25, 2011. [168, at ¶ 34.]

## I.     Plaintiff's Termination

Plaintiff filed a charge of age discrimination with the Equal Employment Opportunity commission ("EEOC") on or about March 28, 2011. [148 at ¶ 62; 168, ¶ 35.] The EEOC asked Plaintiff if he wanted them to dismiss the charge or to investigate it, which would take time. Plaintiff asked the EEOC to dismiss the charge so he could file a lawsuit and not wait for an investigation. [168, ¶ 35.] PCH received Plaintiff's first EEOC charge on April 4, 2011. [148 at ¶ 63.] Baron knew about Plaintiff's EECO charge and dismissal before Plaintiff was terminated. [168, Exhibit D, (Baron Deposition II), 258:8–10.] Baron testified that Plaintiff's EEOC charge played no role in his decision to terminate Plaintiff's employment. [*Id.* at ¶ 64.] Defendant Lash did not know about Plaintiff's EEOC charge until after Plaintiff was terminated. [*Id.* at ¶ 65.]

Defendant Lash recommended that Plaintiff be terminated, and Baron reviewed the recommendation, discussed it with Defendant Lash, and agreed. [148, Exhibit D (Baron Deposition), 217:5–10.] Plaintiff was terminated on April 8, 2011. [*Id.* at ¶ 50.] Defendants maintain that Plaintiff was terminated from PCH because of his failure to fulfill his job duties. [*Id.* at ¶ 32.] Specifically, Defendants contend that Plaintiff repeatedly failed to bring PCH's

electrical equipment database into compliance with Defendant Lash's requirements and the Joint Commission standards. [See *id.*] Plaintiff counters that Baron had Plaintiff fired because of his age and "set [Plaintiff] up as a scape goat should the hospital fail its next Joint Commission review." [168, at ¶ 42.] Plaintiff contends that Baron placed blame on Plaintiff to cover up his own failures and Defendant Lash's failures in not updating the databases. [*Id.*]

Defendants contend that after Plaintiff was discharged, Defendant Lash was able to correct in two weeks the errors in the electrical equipment database that Plaintiff was unable to correct in several years. [148 at ¶ 52.] On June 13, 2011, PCH hired Charles Schmitt, age fifty-three, as the Electrical Department Supervisor. [*Id.* at ¶ 53.] Plaintiff filed a second charge of discrimination on April 9, 2011, alleging that he was terminated in retaliation for engaging in protected activity. [*Id.* at ¶ 66.] PCH received Plaintiff's second EEOC charge on April 13, 2011. The charge was dismissed on April 19, 2011. [*Id.* at ¶ 67.]

When Plaintiff was terminated, his final paycheck did not include payment for accrued but unused sick time. [148, at ¶ 16.] About one year after his termination, Plaintiff met with a psychiatrist, who concluded that he was suffering from major depression. [See 168, Exhibit 1 (Trum Deposition), at 14:24, 17:8–10.]

## J.      Procedural Background

Plaintiff filed this lawsuit on July 5, 2011, bringing various claims against Defendants Lash and PCH. [1.] The Court granted Defendants' motion to dismiss several of Plaintiff's claims for failure to state a claim and permitted Plaintiff to file an amended complaint. [39.] Plaintiff has since amended and corrected his complaint multiple times. [See 44, 66, 104, 118.] On December 11, 2015, Plaintiff filed his second amended complaint [137], which is the operative complaint in this case, alleging unlawful termination under the Age Discrimination in

Employment Act of 1967, 29 U.S.C. § 621 *et seq.* ("ADEA") (Count I), unlawful retaliation under the ADEA (Count II) and under Illinois law (Count III), breach of agreement against PCH (Count IV), defamation against Defendant Lash (Count V) and against PCH (Count VIII), intentional and negligent infliction of emotional distress against PCH (Counts VI and VII), and breach of contract (Count IX) and violation of the Illinois Wage Payment and Collection Act (Count X) for failure to pay for unused sick leave. Currently before the Court are the parties' cross-motions for summary judgment.

## II.    Legal Standard

Summary judgment is proper where there is "no dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing the lack of any genuine issue of material fact. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In evaluating a motion for summary judgment, the Court will construe all facts in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of the nonmoving party. *Bell v. Taylor*, 827 F.3d 699, 704 (7th Cir. 2016). Where, as here, the parties have submitted cross-motions for summary judgment, the Court "take[s] the motions one at a time, construing all facts and drawing all reasonable inferences in favor of the non-moving party." *Black Earth Meat Mkt., LLC v. Vill. of Black Earth*, 834 F.3d 841, 847 (7th Cir. 2016). However, the Court will not draw inferences that are "supported by only speculation or conjecture," *Williams v. Brooks*, 809 F.3d 936, 944 (7th Cir. 2016), cert. denied, 2016 WL 4367440 (U.S. Oct. 17, 2016) (quoting *Argyropoulos v. City of Alton*, 539 F.3d 724, 732 (7th Cir. 2008)) (internal citations omitted),

and "[c]onclusory allegations alone cannot defeat a motion for summary judgment." *Thomas v. Christ Hosp. & Med. Ctr.*, 328 F.3d 890, 892 (7th Cir. 2003).

It is not the role of the Court to scour the record in search of evidence to defeat a motion for summary judgment; instead, the nonmoving party bears the responsibility of identifying evidence to defeat summary judgment. *Harney v. Speedway SuperAmerica, LLC*, 526 F.3d 1099, 1104 (7th Cir. 2008). To avoid summary judgment, the nonmoving party must go beyond the pleadings and "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 250. Summary judgment is proper if the nonmoving party "'fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Ellis v. CCA of Tennessee LLC,* 650 F.3d 640, 646 (7th Cir. 2011) (quoting *Celotex,* 477 U.S. at 322). The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). In other words, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252.

## III.    Analysis

### A.    Age Discrimination Under the ADEA (Count I)[3]

Plaintiff brings a claim against PCH for unlawful termination in violation of the ADEA.

---

[3] Plaintiff purports to bring his ADEA claim under both a disparate treatment and a disparate impact theory. [137 (Second Amended Complaint), at ¶ 44.] "Disparate treatment occurs when an employee is treated less favorably simply because of race, color, sex, national origin, or in our case, age." *E.E.O.C. v. Francis W. Parker Sch.*, 41 F.3d 1073, 1076 (7th Cir. 1994). "Disparate impact is the result of more subtle practices, which on their face are neutral in their treatment of different groups but which in fact fall more harshly on one group than another." *Id.* However, Plaintiff's disparate impact theory fails because he has not identified "the *specific* employment practices" that allegedly have an adverse impact on older employees. *Smith v. City of Jackson, Miss.*, 544 U.S. 228, 241 (2005) (citation and internal quotation marks omitted). Thus, the Court will focus on Plaintiff's disparate treatment theory.

The ADEA prohibits an employer from discriminating against an individual on the basis of his or her age. *Pitasi v. Gartner Grp., Inc.*, 184 F.3d 709, 714 (7th Cir. 1999); see also 29 U.S.C. § 623(a) ("It is unlawful for an employer * * * to discharge any individual * * * because of such individual's age."). A plaintiff employee may prevail on an age discrimination claim if he can show that his termination would not have occurred "but for" his employer's age-based discriminatory motive. *Pitasi*, 184 F.3d at 714. The Seventh Circuit recently jettisoned the long-standing practice of distinguishing between the "direct" and "indirect" methods of analyzing discrimination claims. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 763–66 (7th Cir. 2016). *Ortiz* instructs courts to simply ask "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's * * * proscribed factor caused the discharge[.]" *Id.* at 765. The Court is to consider the evidence as a whole, rather than asking whether any particular piece of evidence proves the case by itself. *Id.*

Ortiz did not, however, alter the burden-shifting framework set forth in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–04 (1973). *Id.* at 766. Rather, *Ortiz* makes clear that "*McDonnell Douglas* is not the only way to assess circumstantial evidence of discrimination." *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017); *Zegarra v. John Crane, Inc.*, 2016 WL 6432587, at *10 (N.D. Ill. Oct. 31, 2016) ("[T]he pattern identified in *McDonnell Douglas* is just one way that the record evidence could enable a reasonable juror to find discrimination."). Because the *McDonnell Douglas* framework survives *Ortiz* and because the parties have presented their arguments in those terms,[4] the Court will first assess Plaintiff's claim under *McDonnell Douglas*. The Court will then "assess cumulatively all the evidence presented by [Plaintiff] to determine whether it permits a reasonable factfinder to determine that

---

[4] Defendants filed their motion for summary judgment on May 6, 2016, and Plaintiff filed his cross-motion for summary judgment on August 18, 2016, one day prior to the Seventh Circuit issuing its opinion in *Ortiz*, 834 F.3d 760, on August 19, 2016.

[his termination] was attributable to [his] age." *David*, 846 F.3d at 224; see also *Smart v. DHL Express (USA), Inc.*, 2017 WL 449178, at *3 (N.D. Ill. Feb. 2, 2017).

*1.* McDonnell Douglas

Under the burden-shifting framework of *McDonnell Douglas*, a plaintiff must first state a *prima facie* case of discrimination by demonstrating, by a preponderance of the evidence, that: (1) he is a member of a protected class; (2) at the time of termination, he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) he was treated less favorably than younger employees who are "similarly situated." *Peele v. Country Mut. Ins. Co.*, 288 F.3d 319, 326 (7th Cir. 2002). Once Plaintiff establishes a prima facie case of age discrimination, the burden shifts to the employer to articulate "a legitimate, non-discriminatory reason for the employee's termination." *Id.* "An employer that has proffered a legitimate, non-discriminatory reason for the discharge is entitled to summary judgment unless the plaintiff presents evidence that the proffered reasons are pretexts for discrimination." *Collier v. Budd Co.*, 66 F.3d 886, 889 (7th Cir. 1995).

Here, it is undisputed that Plaintiff was a member of the protected class of employees "at least 40 years of age," 29 U.S.C. § 631(a), at the time of his termination and that he suffered an adverse employment action. Nevertheless, Defendants argue that Plaintiff is otherwise unable to state a *prima facie* case of age discrimination. First, Defendants argue that Plaintiff was not meeting his employer's legitimate employment expectations. Second, Defendants argue that Plaintiff cannot point to a similarly situated comparator who was treated more favorably.

*a.* *Employment Expectations*

The record is replete with evidence of Plaintiff's repeated performance problems. These problems began as early as November 2008, when Defendant Lash questioned Plaintiff about the

completeness of the electrical equipment database, including the accuracy of the preventative maintenance tasks listed, and Plaintiff agreed to make improvements in these areas. [148, at ¶ 38.] Plaintiff was again reprimanded for his poor performance involving the electrical database during his performance review in September 2010. [168, Exhibit 23 (September 30, 2010 Management Performance Appraisal).] On December 30, 2010, Defendant Lash told Plaintiff that he was still not satisfied with his progress on the electrical equipment database and gave Plaintiff thirty days to bring the database into full compliance. [148, at ¶ 40; 148, Exhibit B1 (December 30, 2010 File Memo).] On February 4, 2011, Defendant Lash issued Plaintiff a Corrective Action Form indicating that Plaintiff had failed to fulfill his job duties related to the electrical database. [148, Exhibit A7.] Finally, on March 8, 2011, Defendant Lash informed Plaintiff that there were still areas of the database that required additional work in order to meet department and Joint Commission requirements. [*Id.* at ¶ 46; 168, at Exhibit 29.] See *Biolchini v. Gen. Elec. Co.*, 167 F.3d 1151, 1154 (7th Cir. 1999) (plaintiff was unable to show that he was meeting his employer's legitimate job expectations where the record clearly showed that human resources had received complaints about plaintiff); cf. *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 358 (7th Cir. 1996) (plaintiff established that he met employer's legitimate expectations where employer gave plaintiff a substantial raise just before he was fired and employer provided no documentary evidence that plaintiff did not meet its legitimate expectations).

Plaintiff argues that the fact that he worked at PCH for eight years should give rise to an inference that he performed satisfactorily, citing *Heinze v. S. Illinois Healthcare*, 2010 WL 276722, at *3 (S.D. Ill. Jan. 19, 2010). However, Plaintiff misconstrues *Heinze*, which held that a plaintiff's allegations that she is over fifty years old, "that she worked for [the defendant employer] for approximately eight years (giving rise to an inference that she performed her job

satisfactorily),” and that she was terminated and replaced by a less-qualified, younger employee, were adequate to survive a Rule 12(b)(6) motion to dismiss for failure to state a claim.  *Id. Heinze*, which is not binding on this Court, does not stand for the proposition that Plaintiff’s eight year tenure at PCH, standing alone, is sufficient to prove by a preponderance of the evidence that at the time of termination, he was meeting his employer’s legitimate employment expectations.

Next, Plaintiff argues that his own testimony establishes that he excelled in his position. He contends that he should not have been given the February 2011 Corrective Action Form because Defendant Lash’s merger of the databases “sabotaged [Plaintiff’s] work that was otherwise completed.”  [169, at 8.]  Plaintiff also emphasizes that he completed the tasks assigned to him in March 2011.  Plaintiff’s arguments fail for several reasons.  First, Plaintiff’s own general averments of adequate performance are insufficient to create a factual issue to defeat summary judgment.  *Sirvidas v. Commonwealth Edison Co.*, 60 F.3d 375, 378 (7th Cir. 1995).  Thus, Plaintiff does not raise a material issue of fact on the question of the quality of his work merely by challenging the judgment of his superiors.  *Huhn*, 718 F.2d at 244; see also *Fortier v. Ameritech Mobile Commc’ns, Inc.*, 161 F.3d 1106, 1114 (7th Cir. 1998) (explaining that plaintiff’s subjective self-appraisal cannot create a genuine issue of fact regarding the honesty of employer’s assessment of his performance); *Gustovich v. AT & T Communications, Inc.*, 972 F.2d 845, 848 (7th Cir. 1992) (noting that “[a]n employee’s self-serving statements about his ability” are insufficient to contradict an employer’s negative evaluation).

Turning to Plaintiff’s more specific challenges to his employer’s claim of deficient performance, Plaintiff only challenges the February 2011 Corrective Action Form and not the negative performance reviews he received in September 2010, December 2010, and March 2011.

Although Plaintiff argues that he only received the February 2011 Corrective Action Form because of the merging of the two databases, Defendant Lash advised Plaintiff that deficiencies caused by the merging of the two databases were not held against him. [148, at ¶ 43; 168, at ¶ 44.] Defendant Lash also pointed out other parts of the database assignment that Plaintiff still had not completed by February 2011, including setting up correct preventative maintenance procedures on electrical infrastructure equipment and updating the emergency procedures. [148, Exhibit A8 (February 4, 2011 File Memo).] Further, even assuming that Plaintiff did complete the database updating assignment by March 2011, this does not change the fact that Plaintiff had been given several extensions on his deadline for this assignment since as early as 2008 and had missed numerous previous deadlines, as demonstrated by the documentary evidence.

Finally, Plaintiff argues that it was not his job to update the electrical database and that rather, it was Defendant Lash's job to do so. However, this argument fails because Plaintiff conceded that as his supervisor, Defendant Lash could delegate work to him and was responsible for ensuring that he performed the work assigned to him. [148, at ¶ 34; 168, at ¶ 34.] Plaintiff further admitted that Defendant Lash delegated to Plaintiff the responsibility of maintaining the electrical equipment database. [168, at ¶ 35.] Plaintiff's email to Defendant Lash stating his belief that maintaining the database and establishing maintenance procedures was a "job level above [his]," [168, Exhibit 24], does not create a genuine issue of material fact about whether Plaintiff's employer expected him to fulfill these responsibilities. See *Wohl v. Spectrum Mfg., Inc.*, 94 F.3d 353, 359 (7th Cir. 1996) (Bauer, J., dissenting) ("There is simply no way of stretching a statement, 'I didn't do what the company expected but it wasn't my fault,' into an age discrimination claim."). Further, Plaintiff's allegation that it was not his job to maintain the database is blatantly contradicted by his February 4, 2011 email to Defendant Lash asking for a

promotion. In this email, Plaintiff acknowledges that it was his responsibility to ensure the accuracy of the electrical database and maintenance procedures and asserts that he has been working on both the equipment database and the panel database. [168, Exhibit 24.] Thus, Plaintiff's unsupported assertions that any deficiencies in the database were Defendant Lash's responsibility and that he was performing his job satisfactorily are contradicted by the record evidence and hold no weight. See *Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 503 (7th Cir. 2004) ("[S]elf-serving statements contained in an affidavit will not defeat a motion for summary judgment when those statements are without factual support in the record." (citation and internal quotation marks omitted)).

Finally, to the extent that Plaintiff argues that Defendant Lash gave him assignments that were impossible to complete, this argument fails because the ADEA was not intended to serve as "a vehicle for judicial review of business decisions." *Huhn v. Koehring Co.*, 718 F.2d 239, 244 (7th Cir. 1983). As long as the employer's expectations are reasonable and the employer makes the employee aware of its expectations, the Court will not inquire into Defendants' method of conducting its business. *Id.*; see also *Coco v. Elmwood Care, Inc.*, 128 F.3d 1177, 1180 (7th Cir. 1997) (explaining that an employer's expectations are "legitimate" as long as they are "bona fide" and not "phony," "for it is no business of a court in a discrimination case to decide whether an employer demands 'too much' of his workers"). Thus, Plaintiff has not demonstrated that he was meeting his employer's legitimate employment expectations, and he has not established a prima facie case of age discrimination under *McDonnell Douglas.*

### b. Similarly Situated Comparator

Even assuming that Plaintiff had established that he met his employer's legitimate expectations, he fails to establish a prima facie case because Plaintiff cannot point to a similarly

situated comparator who was treated more favorably. A plaintiff may demonstrate that another employee is "similarly situated" to him by "show[ing] that there is someone who is directly comparable to [him] in all material respects." *Peele*, 288 F.3d at 326 (citation and internal quotation marks omitted). The "analysis calls for a 'flexible common sense' examination of all relevant factors." *Coleman v. Donahoe*, 667 F.3d 835, 846 (7th Cir. 2012). The purpose of the inquiry "is to eliminate other possible explanatory variables, 'such as differing roles, performance histories, or decision-making personnel, which helps isolate the critical independent variable'—discriminatory animus." *Id.* (citation omitted).

In determining whether employees are similarly situated, "a court must look at all relevant factors, the number of which depends on the context of the case." *Id.* (citation and internal quotation marks omitted). Relevant factors include whether the comparators held the same job description, were subject to the same standards, were subordinate to the same supervisor, had comparable experience, education, and other qualifications, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them. See *David*, 846 F.3d at 226; *Coleman* 667 F.3d at 847. Importantly, "[a]n employee who does not have a similar disciplinary history and performance record as the plaintiff is not similarly situated." *Simpson v. Franciscan All., Inc.*, 827 F.3d 656, 662 (7th Cir. 2016); accord *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008); *Smart*, 2017 WL 449178, at *3; *Harris v. Office of the Chief Judge of the Circuit Court of Cook Cty.*, 2016 WL 7228703, at *3 (7th Cir. Dec. 13, 2016).

Plaintiff argues that three younger, similarly situated employees were treated more favorably: Rich Chapan, Ken Lash (a Defendant in this case), and Joseph Stroner. The Court will address each alleged comparator in turn. First, Plaintiff, who was fifty-nine at the time of

termination, argues that Rich Chapan, who was thirty-nine at the time of Plaintiff's termination, was neither disciplined nor fired "under the exact same course of events." [169, at 9–10.] Chapan position at PCH is Chief Operating Engineer, and he reports to Tony Maillero, Manager of Plant Engineering. [148, at ¶ 6.] Plaintiff contends that Chapan is similarly situated to Plaintiff because they were both instructed to enter information for several hundred pieces of equipment into electrical databases. Additionally, Plaintiff contends that they were both electrical supervisors, reported to managers, were subordinate to Vice President Baron, dressed business casual, received "Management Performance Appraisals," and attended bi-weekly meetings with all managers and supervisors.

The Court concludes that Chapan is not similarly situated to Plaintiff for several reasons. Chapan held a different position in a different department than Plaintiff: Chapan is Chief Operating Engineer in the Plant Engineering Department, and Plaintiff's position was Electrical Department Supervisor in the Clinical Engineering Department. Further, Chapan reported to a different manager than Plaintiff (Chapan reported to Tony Maillero, and Plaintiff reported to Defendant Lash), worked in a lower pay grade than Plaintiff, and is paid on an hourly basis, whereas Plaintiff was paid a salary. [148, at ¶ 58.] Finally, Chapan completed his electrical database assignment, whereas Plaintiff failed to adequately complete his database assignment, as evidenced by multiple documents in the record. Chapan testified in his deposition that he could not recall what the deadline was for his database assignment, if there was one, but that he did know that if he did not complete the assignment, he would be subject to discipline. [168, Exhibit 33 (Rich Chapan Deposition), 63:7–11.] Plaintiff does not allege that he has any personal knowledge of Chapan's disciplinary history or performance record at PCH. Thus, Chapan is not a similarly situated comparator.

Next, Plaintiff argues that Defendant Lash, who was forty-six at the time of Plaintiff's termination, is a similarly situated comparator. Plaintiff contends that they were both subordinate to Baron, that Defendant Lash failed to meet Baron's instructions to bring the electrical database into full compliance and was not terminated, and that Defendant Lash stole from the hospital but was not terminated. This argument also fails. Plaintiff and Defendant Lash hold different positions, as Defendant Lash was Plaintiff's supervisor. Ordinarily, a plaintiff is not similarly situated to another employee when the plaintiff is subordinate to that employee. *Patterson v. Indiana Newspapers, Inc.*, 589 F.3d 357, 366 (7th Cir. 2009). Although courts have held that in extraordinary cases where there are enough common factors to allow for a meaningful comparison, a supervisor can serve as a similarly situated comparator, see *Jones v. B & J Rocket Am., Inc.*, 148 F. Supp. 3d 755, 768 (N.D. Ind. 2015), there are no common factors supporting Plaintiff's argument in this case. Plaintiff alleges that Defendant Lash is similarly situated because he also failed to update the electrical database, but Plaintiff admits that Defendant Lash delegated this task to Plaintiff. Thus, Plaintiff's own failure to complete his assignment is the reason for Defendant Lash's failure to meet Baron's instructions to bring the electrical database into full compliance. Finally, Defendant Lash's alleged theft does not provide for a valid comparison, as Plaintiff was allegedly terminated because of his poor performance, not because of similar misconduct. See *Cole*, 667 F.3d at 850 (explaining that the similarly situated inquiry often hinges on whether co-workers engaged in comparable rule or policy violations and received more lenient discipline).

Finally, Plaintiff argues that Joseph Stroner is a similarly situated comparator. Stroner was thirty-three at the time of Plaintiff's termination and was a Safety Officer in the Performance Improvement Department of PCH. [148, at ¶ 6.] Plaintiff contends that Stroner is similarly

25

situated because he was also subordinate to Baron. Plaintiff alleges that Stroner was not disciplined under "identical if not more egregious conduct." [169, at 14.] Plaintiff contends that the Joint Commission found violations on fire extinguishers that Stroner was responsible for inspecting, yet Stroner was not disciplined. [*Id.*] Again, Plaintiff's argument fails. Plaintiff and Stroner did not work in the same department, did not hold the same position, did not report to the same supervisor, and did not have similar responsibilities. See *David,* 846 F.3d at 227 (employees not similarly situated where their core duties of their positions did not align). Thus, Plaintiff has not established that a younger, similarly situated comparator received more favorable treatment and has therefore failed to establish a prima facie case of age discrimination.

### c.   *Pretext*

Even if Plaintiff had established a prima facie case, he fails to offer evidence to demonstrate a triable issue of fact on whether Defendants' proffered reason for terminating Plaintiff—his poor job performance and repeated failure to update the electrical database—was pretextual. To show pretext, a plaintiff must show that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez v. Illinois*, 488 F.3d 773, 777 (7th Cir. 2007). "The question is not whether the employer's stated reason was inaccurate or unfair, but whether the employer honestly believed the reason it has offered to explain the discharge." *O'Leary v. Accretive Health, Inc.*, 657 F.3d 625, 635 (7th Cir. 2011); see also *Coleman*, 667 F.3d at 852 ("It is not the court's concern that an employer may be wrong about its employee's performance, or may be too hard on its employee."). The "only question is whether the employer's proffered reason was pretextual, meaning that it was a lie." *Coleman*, 667 F.3d at 852. "Where, as here, the employer contends that the plaintiff's job performance was wanting, the plaintiff must do more than dispute the validity of the employer's

criticisms." *O'Leary*, 657 F.3d at 635. Rather, the plaintiff must "identify such weaknesses, implausibilities, inconsistencies, or contradictions" in asserted reason such "that a reasonable person could find [it] unworthy of credence." *Coleman*, 667 F.3d at 852. The plaintiff must also "provide evidence of at least an inference that the real reason for [the adverse employment action] was discriminatory." *Perez*, 488 F.3d at 778 (alteration in original) (citation and internal quotation marks omitted).

Here, Plaintiff again relies on his own disagreement with his employer's assessment of his performance. However, this is insufficient to show pretext. See *Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011), overruled on other grounds by *Ortiz*, 834 F.3d 760, ("If such disagreements were enough to avoid summary judgment and go to trial on an indirect proof case, summary judgment would become extinct and employer's evaluations of employees would be supplanted by federal juries' evaluations."). Plaintiff argues that contrary to Defendant Lash's assertion that his spot-check of Plaintiff's database work in March 2011 revealed an error rate of over 50%, the error-rate was actually 2.67%. However, Plaintiff cites to no evidence to support this assertion, and he does not allege that Defendant Lash did not actually believe that Plaintiff's error rate was over 50%. See *Russell v. Acme-Evans Co.*, 51 F.3d 64, 69 (7th Cir. 1995) (affirming summary judgment for employer and noting that in evaluating pretext, the issue was not the adequacy in fact of the plaintiff's performance, but the honesty of the company's belief that it was inadequate, and thus the plaintiff's own opinion that his performance was adequate was not enough to defeat summary judgment).

Plaintiff argues that his work was sabotaged by Defendant Lash and Baron when the panel database was merged into the equipment database. However, Defendant Lash advised Plaintiff that deficiencies caused by the merging of the two databases were not held against

him—and even if that testimony were not credited, Defendant Lash found other deficiencies in Plaintiff's work, including setting up correct preventative maintenance procedures on electrical infrastructure equipment and updating the emergency procedures. [148, Exhibit A8 (February 4, 2011 File Memo).] Plaintiff also relies on the allegedly similarly situated comparators to show pretext, but as discussed above, Chapan, Defendant Lash, and Stroner are not similarly situated to Plaintiff. Thus, Plaintiff fails to offer evidence to demonstrate a triable issue of fact on whether Defendants' proffered reason for terminating Plaintiff was pretextual.

### 2. Cumulative Assessment of All Evidence

Consistent with *Ortiz*, the Court will assess cumulatively all of the evidence presented by Plaintiff without the assistance of the *McDonnell Douglas* paradigm to evaluate whether a reasonable factfinder could conclude that Plaintiff was terminated because of his age. See *David*, 846 F.3d at 224; *Smart*, 2017 WL 449178, at *3. Taking a step back and viewing the evidence as a whole, in the light most favorable to Plaintiff, the Court concludes that Plaintiff has failed to set forth specific facts showing a genuine issue for trial on his age discrimination claim.

Viewing the evidence in the light most favorable to Plaintiff, Defendant Lash asked Plaintiff to work on updating the electrical database as early as 2008. [148, at ¶ 37.] Plaintiff was asked to improve on this task in his September 2010 Management Performance Appraisal. [148, Exhibit A5.] In December 2010, Plaintiff was given a thirty day deadline to complete the assignment, but the requirements of the assignment changed in January 2011 when the panel database was merged into the equipment database. Defendant Lash told Plaintiff that any deficiencies caused by the merging of the two databases were not held against him. Plaintiff emailed Defendant Lash in February 2011, acknowledging that he had been working on the equipment database and the panel database, but stating that he believed this to be a job level

above his, and asking for a promotion and a salary increase. [168, Exhibit 24.] Defendant Lash issued Plaintiff a corrective action form in February 2011, explaining the still-existing deficiencies in his work and giving him a new deadline of February 21, 2011. On March 8, 2011, Defendant Lash found that areas of the database still required additional work to meet department and Joint Commission requirements and gave Plaintiff yet another deadline of March 25, 2011.

Plaintiff was terminated on April 8, 2011, when he was fifty-nine years old. Defendants allege that Plaintiff was terminated from PCH because of his failure to fulfill his job duties relating to the electrical database. Plaintiff asserts that the real reason for his termination was age discrimination, but he offers no evidence that anyone at PCH bore animus toward him due to his age or that his termination resulted from such alleged animus. See *Zegarra*, 2016 WL 6432587, at *10 (granting employer's motion for summary judgment where "[o]ther than his subjective beliefs, [plaintiff] adduces no direct or circumstantial evidence that anyone at [defendant employer], much less anyone with decisionmaking authority over his employment, bore racial, color-based, or national origin-based animus toward him"). Based on these facts, no reasonable factfinder could conclude that Plaintiff was terminated because of his age.

Plaintiff argues that Defendant Lash intentionally set him up for failure and created impossible deadlines by adding sixteen "new job tasks" between January 2011 and March 16, 2011. However, Plaintiff's allegations about these "new" job tasks are contradicted by evidence in the record. For example, Plaintiff alleges that on February 4, 2011, he was given the "new task" of completing the infrared scanning maintenance routine. [168, at ¶ 11(c).] However, Plaintiff's December 30, 2010 email to Defendant Lash acknowledges that infrared scanning was already within the scope of Plaintiff's responsibilities, and thus was not a new task added to

Plaintiff's workload shortly before his termination. [See 168, Exhibit 16 (December 30, 2010 Email).] Plaintiff also alleges that on March 4, 2011, he was assigned the additional task of updating emergency procedures. [168, at ¶ 11(d).] However, the record indicates that Defendant Lash assigned this task to Plaintiff as early as December 30, 2010. [148, Exhibit A8 (February 4, 2011 File Memo).]

Plaintiff further alleges that on March 8, 2011, Defendant Lash added the additional task of requiring Plaintiff to retroactively add to the database major events and repairs for new electrical equipment. However, this appears to be a suggestion for improvement on one of Plaintiff's pre-existing assignments, rather than a new task. Defendant Lash's March 8, 2011 memo to Plaintiff explains that since Plaintiff delayed in entering the new electrical infrastructure equipment into the database, significant history information was missing from the database, which is why Defendant Lash asked Plaintiff to add major events and repairs from the past year into the database. [168, Exhibit 29 (March 8, 2011 Memo).] Further, Defendant Lash asked Plaintiff to "to verify the accuracy of the electrical equipment database and service histories, including entering incoming inspections promptly and completely" as early as September 30, 2010. [168, Exhibit 23 (September 30, 2010 Management Performance Appraisal).] Thus, Plaintiff's allegation that Defendant Lash set him up for failure by adding these "new" job tasks is supported only by Plaintiff's self-serving unsworn declaration[5] [168, Exhibit 2] and contradicted by documentary evidence in the record. An unsworn declaration supported by facts in the record can create a genuine issue of material fact to defeat summary judgment. *Nedzvekas v. LTV Copperweld*, 356 F. Supp. 2d 904, 908 (N.D. Ill. 2005). But

---

[5] "Under 28 U.S.C. § 1746, an unsworn declaration which is dated and signed by the declarant under the penalty of perjury, has the same force and effect as a sworn affidavit for the purposes of any requirement imposed by any federal rule or regulation." *Davis v. Frapolly*, 756 F. Supp. 1065, 1067 (N.D. Ill. 1991).

"[s]elf-serving statements contained in an affidavit [or an unsworn declaration] will not defeat a motion for summary judgment when those statements are without factual support in the record." *Id.* (citation and internal quotation marks omitted).

Additionally, it is not within the purview of the Court to decide whether the assignments given to Plaintiff were unfair or overly burdensome. The Court will not "sit as a super-personnel department that reexamines an entity's business decisions." *Kralman v. Illinois Dep't of Veterans' Affairs*, 23 F.3d 150, 156 (7th Cir. 1994) (citation and internal quotation marks omitted). The question before this Court is not whether Defendants' stated reason for terminating Plaintiff was inaccurate or unfair; rather, it is whether Defendants honestly believed that Plaintiff had repeatedly failed to fulfill his duties related to the electrical database. See *Coleman*, 667 F.3d at 852 ("It is not the court's concern that an employer may be * * * too hard on its employee."); *Bienkowski v. American Airlines*, 851 F.2d 1503, 1508 (5th Cir. 1988) ("The ADEA cannot protect older employees from erroneous or even arbitrary personnel decisions, but only from decisions which are unlawfully motivated."). Plaintiff has not provided any evidence indicating that Defendants did not honestly believe that Plaintiff had work performance issues or that Defendants terminated Plaintiff because of age-related animus.

Finally, Plaintiff argues that Baron's February 3, 2011 review of Defendant Lash incorrectly indicates that in September 2010 Defendant Lash gave Plaintiff a three month deadline to complete preventative maintenance on critical utility equipment. [See 148, Exhibit D6.] First of all, Plaintiff makes this argument in his response to Defendants' Rule 56.1 statement of facts, which is improper. Thus, the Court need not consider this argument. See L.R. 56.1(a), 56.1(b)(3)(B); see also *Malec*, 191 F.R.D. at 584; *Moore-Fotso*, 2016 WL 5476235, at *2. Further, this argument also fails on the merits. Although Plaintiff is correct that his

September 30, 2010 Management Performance Appraisal did not contain a specific deadline for this assignment and Defendant Lash testified in his deposition that he did not give Plaintiff a specific deadline for this assignment, [148, Exhibit B (Lash Deposition), 146:14–147:3], this is not enough to create a genuine issue of material fact for trial. Baron's error about a deadline does not give rise to an inference of age discrimination, as Plaintiff fails to offer any evidence that this error has even an arguable connection to his age. And the error in Baron's memo does not change the fact that Plaintiff had been reprimanded several times for failing to meet his actual deadlines for the database assignment. Defendant Lash also testified that although he did not set a specific deadline during Plaintiff's September review, Plaintiff's work on the project was already late at that time. [*Id.*]

Therefore, based on a cumulative assessment of all of the evidence, viewed in the light most favorable to Plaintiff, no reasonable juror could conclude that Plaintiff was terminated because of his age, and the Court grants summary judgment in favor of Defendants on Plaintiff's age discrimination claim (Count I).

**B.      Unlawful Retaliation (Count II)**

Plaintiff also brings a claim against PCH for unlawful retaliation in violation of the ADEA, 29 U.S.C. § 623(d). Although the Court granted summary judgment in favor of Defendants on Plaintiff's underlying age discrimination claim, the viability of his retaliation claim does not turn on the success of his discrimination claim. *Horwitz v. Bd. of Educ. of Avoca Sch. Dist. No. 37*, 260 F.3d 602, 612 (7th Cir. 2001). To prove his unlawful retaliation claim, Plaintiff must show that: (1) he engaged in statutorily protected activity; (2) he suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse action. *Id.* The parties do not dispute that Plaintiff's filing his EEOC charge

was protected activity or that Plaintiff was terminated.[6]  Thus, this issue turns on whether Plaintiff can establish a causal connection.

Plaintiff argues that the "suspicious timing" of his termination is evidence of causation, since he filed his EEOC charge on or about March 28, 2011, PCH received Plaintiff's first EEOC charge on April 4, 2011, and Plaintiff was terminated on April 8, 2011.  However, "suspicious timing alone rarely is sufficient to create a triable issue." *Tomanovich*, 457 F.3d at 665 (citation and internal quotation marks omitted); see also *Wyninger v. New Venture Gear, Inc.*, 361 F.3d 965, 981 (7th Cir. 2004) ("[I]t is clear that 'mere temporal proximity' is not enough to establish a genuine issue of material fact." (citation omitted)); cf. *Frey v. Coleman*, 141 F. Supp. 3d 873, 884 (N.D. Ill. 2015) (plaintiff provided sufficient circumstantial evidence to establish causation in a retaliatory discharge case where she relied not only on the timing of her termination, but also on the employer's admitted use of pretext to justify the termination).  "Speculation based on suspicious timing alone * * * does not support a reasonable inference of retaliation; instead, plaintiffs must produce facts which somehow tie the adverse decision to the plaintiffs' protected actions." *Sauzek v. Exxon Coal USA, Inc.*, 202 F.3d 913, 918 (7th Cir. 2000).

Plaintiff has not presented any additional circumstantial evidence beyond the temporal relation between his EEOC charge and his termination that might support a causal link between the two.  In fact, the circumstantial evidence points in the other direction.  It is undisputed that

---

[6] Although Plaintiff's complaint about age discrimination to the Human Resources Department in February 2011 would qualify as protected activity, see *Malin v. Hospira, Inc.*, 762 F.3d 552, 558 (7th Cir. 2014), Plaintiff does not pursue an argument related to this complaint, and he does not set forth any evidence indicating that Defendant Lash or Baron knew about his complaint to Human Resources.  It is undisputed that Plaintiff told Defendant Lash only that he was going to complain to Human Resources that Chapan was not disciplined for database deficiencies and that Plaintiff said nothing about age discrimination.  [148, at ¶ 54; 168, at ¶ 54.]  See *Tomanovich v. City of Indianapolis*, 457 F.3d 656, 663 (7th Cir. 2006) ("Merely complaining in general terms of discrimination or harassment, without indicating a connection to a protected class or providing facts sufficient to create that inference, is insufficient [to state a claim for retaliation].").

Defendant Lash did not know about Plaintiff's EEOC charge until after Plaintiff was terminated, [148, ¶ 65], and thus could not have recommended Plaintiff's termination as retaliation. See *Smith v. Lafayette Bank & Trust Co.*, 674 F.3d 655, 658 (7th Cir. 2012) ("An employer must have actual knowledge of the employee's protected activity to state a claim for retaliation."). Baron admits that he knew about Plaintiff's EEOC charge before Plaintiff's termination, but Plaintiff does not produce any evidence showing a causal connection. Plaintiff argues that Baron and Defendant Lash did not discuss the results of Defendant Lash's spot-check with him and thus the reason for Plaintiff's termination could not have been the alleged database deficiencies. However, as discussed above, the record is replete with evidence of Plaintiff's repeated performance problems and Defendant Lash's repeated discussions with Plaintiff about these problems. Thus, Plaintiff offers no reason to believe—let alone any evidence establishing—that Baron agreed with Defendant Lash's recommendation to terminate Plaintiff because of Plaintiff's EEOC charge.

Additionally, even if Plaintiff had presented circumstantial evidence of a retaliatory motive to establish a prima facie case, Defendants have offered a nondiscriminatory reason for Plaintiff's discharge—his poor performance and repeated failure to complete his database assignment—and Plaintiff has not demonstrated that there exists a trial issue of material fact on the question of pretext, as discussed above. See *Lord v. High Voltage Software, Inc.*, 839 F.3d 556, 564 (7th Cir. 2016). Thus, the record does not contain sufficient evidence to permit a reasonable factfinder to conclude that a retaliatory motive caused Plaintiff's charge, and Defendants are entitled to summary judgment on Plaintiff's unlawful retaliation claim.

### C. State Law Claims

Given the foregoing conclusion that Defendants are entitled to summary judgment on

both of Plaintiff's federal claims, the Court must consider whether to exercise its supplemental jurisdiction over Plaintiff's remaining state law claims. Where a district court has original jurisdiction over some claims, it has supplemental jurisdiction over other claims that are so related that they form part of the same case or controversy. 28 U.S.C. § 1367(a); *Miller v. Herman*, 600 F.3d 726, 738 (7th Cir. 2010). If the court has dismissed all claims over which it has original jurisdiction, the court's supplemental jurisdiction persists, but the court has discretion to decline to exercise supplemental jurisdiction. 28 U.S.C. § 1367(c)(3); *Miller*, 600 F.3d at 738 (noting that the decision whether to exercise supplemental jurisdiction is "squarely within [the district court's] discretion"). As the Seventh Circuit consistently has stated, "it is the well-established law of this circuit that the usual practice is to dismiss without prejudice state supplemental claims whenever all federal claims have been dismissed prior to trial." *Groce v. Eli Lilly & Co.*, 193 F.3d 496, 501 (7th Cir. 1999); see also *Wright v. Associated Ins. Co., Inc.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("When all federal claims have been dismissed prior to trial, the principle of comity encourages federal courts to relinquish supplemental jurisdiction[.]"); *Patrick v. City of Chicago*, 662 F. Supp. 2d 1039, 1068 (N.D. Ill. 2009) (granting summary judgment in favor of defendants on federal claims and declining to exercise supplemental jurisdiction over state law claims). Exceptions to this general rule exist:

> (1) when the statute of limitations has run on the pendent claim, precluding the filing of a separate suit in state court; (2) substantial judicial resources have already been committed, so that sending the case to another court will cause a substantial duplication of effort; or (3) when it is absolutely clear how the pendent claims can be decided.

*Davis v. Cook Cty.*, 534 F.3d 650, 654 (7th Cir. 2008) (citation and internal quotation marks omitted).

Here, none of the exceptions applies. First, Illinois has adopted a "rule of tolling," which

provides that if an action "is dismissed by a United States District Court for lack of jurisdiction, * * * then, whether or not the time limitation for bringing such action expires during the pendency of such action, the plaintiff * * * may commence a new action [in state court] within one year or within the remaining period of limitation, whichever is greater, after * * * the action is dismissed by a United States District Court for lack of jurisdiction." 735 ILCS 5/13-217; see also *Davis*, 534 F.3d at 654; *White v. City of Chicago*, 149 F. Supp. 3d 974, 983–84 (N.D. Ill. 2016). Second, this Court has not yet committed "substantial judicial resources" to considering the merits of Plaintiff's state law claims. See *Davis*, 534 F.3d at 654 ("the district court disposed of the federal claims on summary judgment, and so 'substantial judicial resources' have not yet been committed to the case"). Third, it is not clearly apparent how the state law claims would be decided. In these circumstances, the usual rule applies and dictates dismissal without prejudice of Plaintiff's state law claims in Count III through Count X.

## IV.    Conclusion

For the reasons stated above, the Court grants Defendant's motion for summary judgment [146] and denies Plaintiff's cross-motion for summary judgment [167] as to Plaintiff's federal claims in Counts I and II. Plaintiff's remaining state law claims in Count III through Count X are dismissed without prejudice. The Court will enter a final judgment and close the case.

Dated: March 8, 2017

_____
Robert M. Dow, Jr.
United States District Judge